1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   WILFREDO CORTEZ CAUYONG,        )   No. C 12-02606 EJD (PR)
                                     )
12              Petitioner,          )   **ORDER DENYING PETITION FOR**
                                     )   **WRIT OF HABEAS CORPUS;**
13        v.                         )   **DENYING CERTIFICATE OF**
                                     )   **APPEALABILITY**
14   CONNIE GIPSON, Warden,          )
                                     )
15              Respondent.          )
                                     )
16                                   )
                                     )
17   _____     )

18        Petitioner has filed a <u>pro se</u> petition for writ of habeas corpus under 28 U.S.C. §

19   2254 challenging his state conviction.  For the reasons set forth below, the Petition for

20   Wit of Habeas Corpus is **DENIED**.

21

22                            **BACKGROUND**

23        Petitioner was found guilty by a jury in San Mateo County Superior Court of

24   twenty-four counts of lewd and lascivious acts on a child under the age of 14.  (Clerk's

25   Transcript ("CT") 300-303, Ans. Ex. 1.)  The jury also found true the allegations that he

26   engaged in substantial sexual conduct with a victim under the age of 14, and that he

27   committed specified sex offenses against more than one victim.  (<u>Id.</u>)  On May 11,

28   2009, Petitioner was sentenced to twenty-nine years to life in state prison.  (<u>Id.</u> at 467-

**United States District Court**
For the Northern District of California

472)

On July 14, 2011, the state appellate court affirmed the judgment as to counts 5 through 24, and remanded to the trial court for determination whether the prosecution of counts 1 through 4 was timely and for resentencing. (Ans. Ex. 6.) The state high court denied review on October 12, 2011. (Id., Exs. 7, 8.)

Petitioner filed the instant federal habeas petition on May 21, 2012, along with a motion for a stay to exhaust additional claims. The Court granted the stay. (Docket No. 5.)

Petitioner filed a state habeas corpus petition in the California State Supreme Court, which denied the petition on August 8, 2012. (Ans. Exs. 9, 10.) Petitioner was granted a second stay to exhaust two more claims. (Docket No. 15.) The state high court denied the petition on February 11, 2014. (Ans. Exs. 11, 12.)

On August 8, 2014, the Court lifted the stay and issued an order to show cause. (Docket No. 20.)

## FACTUAL BACKGROUND

The California Court of Appeal set forth the following facts[1]:

> On June 1, 2007, the San Mateo County District Attorney filed an information charging defendant with 24 counts, each alleging he committed a lewd and lascivious act on a child under the age of 14 in violation of Penal Code section 288, subdivision (a). The first 12 counts alleged acts against "Jane Doe[]#1" (Jane 1), and the second 12 alleged acts against "Jane Doe #2" (Jane 2). In 14 of the counts, it was alleged that defendant engaged in substantial sexual conduct with a victim under the age of 14 within the meaning of section 1203.066, subdivision (a)(8). It also was alleged in the last paragraph of the information that during the commission of the above "offense(s)," defendant committed an offense specified in section 667.61, subdivision (c), against more than one victim, within the meaning of section 667.61, subdivision (e)(5), the One Strike law.

---

[1]The facts of this case are taken from the California Court of Appeal opinion in *People v. Cauyong*, No. A125119 (Cal. App. 1 Dist. Jul. 14, 2011). (Ans. Ex. 6 ("Op.").)

At the trial in January of 2009, the following evidence was presented. [FN2 omitted.]

### The Prosecution's Case

Jane 1 and Jane 2 were sisters, born in 1989 and 1990 respectively. In 1994, they and their mother, Eileen, who was separated from the girls' father, moved into Eileen's parents' house in Bellevue Street in Daly City and, after moving out, the girls continued to stay there when Eileen was working. Siblings of Eileen lived at the parents' house with their spouses. This included defendant, who was married to one of Eileen's sisters, and stayed in an upstairs bedroom. Relatives, including defendant, would babysit Jane 1 and Jane 2 at the Bellevue Street house when Eileen was at work.

### Jane 1 and Jane 2 Disclose Their Accounts of Abuse

Jane 1 testified that Jane 2 told her in November 2006 that defendant had raped her when Jane 2 was little. Jane 1 told Jane 2 to tell someone, but did not tell her that defendant had done similar acts to her.

In December 2006, Jane 1 disclosed in her high school peer assistance class that defendant had abused her. The teacher, upon learning that Jane 1 had not reported this abuse, took her to his office. Jane 1 knew he would have to report her information. She told him that she had not reported the abuse earlier because she was afraid she would not be believed and thought that the abuse was partly her fault, but was now disclosing the abuse because she had found out the previous week that defendant had also abused Jane 2, and was worried about defendant's eight-year-old daughter.

The teacher called Jane 2 to his office. Jane 1 said that when she, as a little girl, and defendant were alone at her grandmother's house, defendant had kissed her on the mouth, touched her private parts through her clothing, made her pull her pants down, made her touch his penis, eventually had intercourse with her when she was about five years old, and did so more than once. She said she went along with defendant's demands because he threatened to hurt her mother or her family. Jane 2 said that defendant had had her sit on his lap, kissed her on the mouth, touched her, and had intercourse with her one time, which had caused her to bleed. Both Jane 1 and Jane 2 said that the abuse stopped when defendant moved out of their grandparents' house.

The teacher called Child Protective Services (CPS), which reported the allegations to the police. Detective Harrison testified that he spoke to Jane 1 and believed he spoke to Jane 2 at their school.

### Jane 1's Testimony About Defendant's Acts

Jane 1 testified that one day at the Bellevue Street [h]ouse, when she was a five-year-old kindergartener, defendant became

angry and told her to go upstairs with him to his bedroom, where he locked the door and sat on the bed with her. He touched her body, including her chest and vagina, over her clothes. He told her not to tell anyone or he would hurt her mother. She believed him and told no one. He touched her every day after school until some weeks later, when he touched her chest and vagina under the clothes, kissed her, and put his penis in her vagina, which hurt her the first time he did it. He did this "every time" she went in to his bedroom. She made noises when it happened, but he covered her face with a pillow or his hand and told her to stop. After this first time, he put his penis in her vagina "a lot," every time she went into his room. He also masturbated himself, and had her touch his penis with her hand.

Defendant put his penis in Jane 1's vagina from the time she was in kindergarten through the third grade whenever she was at the Bellevue Street house, which was almost every day during the school year and on days during the summer. He did so less when Jane 1 was in fourth grade because she was in after-school programs and did not go to the house as much. It happened less after fourth grade, when he stopped yelling at her to go upstairs.

Jane 1 thought that when she was in fifth grade she kicked defendant between his legs, whereupon he raped her, but did not have a specific memory of it. She also recalled seeing her sister go into defendant's bedroom alone, and suspected she was also being molested by him, but did nothing about it.

The sexual incidents with defendant stopped when Jane 1 was "maybe 10" because she was not going to the house as much. There were no further incidents after defendant and his wife moved away towards the end of Jane 1's time in fifth grade. She would see defendant at family functions, where he would touch her "butt" and try to kiss her when no one was looking.

Jane 1 first revealed details of what defendant had done to her when Detective Harrison interviewed her. She was afraid defendant would hurt her mother if she told anyone, and had seen him hit his wife and daughter. She also thought that telling would drive her family apart.

On cross-examination, Jane 1 also testified that she asked to go places with defendant, went on trips with him, and one time went with him to the Philippines without her parents. She also gave defendant pictures, on which she wrote that she loved him.

### Jane 2's Testimony About Defendant's Acts

Jane 2 testified that she stayed at the Bellevue Street house when her mother went to work. When Jane 1 and their cousin Ken came home from school, they played together downstairs. Jane 2 saw Jane 1 go up to defendant's bedroom on occasion when defendant called her.

When Jane 2 was four, defendant would make her and Ken sit on his lap and pretend to drive in his car. When Jane 2 did this,

defendant's hand would touch her vagina over her clothes.  She hurt and was uncomfortable, but did not say anything to the others.

Defendant started calling her into his bedroom when she was in kindergarten.  The first time, he told her to close the door and lock it, remove her pants, and lie on the bed, which she did.  He got on top of her and put his tongue in her mouth, but she bit his tongue and he stopped kissing her.  Her underwear came off and defendant touched her vagina with his finger.  He put his penis inside her vagina and told her to shake the bed, but to be quiet.  She did not scream because she did not know it was wrong; she also was afraid of defendant because he yelled and was mad all the time.  Afterwards, she hurt and found blood on her underwear.

At first, Jane 2 testified that this happened "a couple of other times," and that she was not sure how many.  Later, she testified that "it happened a lot... like, every other instance."  She told Harrison it happened only once because she remembered defendant directing her only that one time.  She testified that she did not have specific detailed memories of the other days when it happened, but that it happened "a lot."

Sometimes, at defendant's instruction, when the children watched a movie or listened to music in defendant's room, Jane 2 would fall asleep on the bed next to defendant when Ken was also in the bed.  Sometimes, she would wake up and Ken would be gone.  Defendant would put his tongue in her ear.  Other times, he would feel around her vagina through her clothes.  He did this once when Ken was in the bed, but she did not say anything to Ken.

From the time Jane 2 was in kindergarten until the fourth grade, defendant touched her vagina a couple of times a month, including during the summer. Except for a few times, he did this over her clothes.  It stopped when she was in fourth grade, when defendant moved away.  Once, when she was in fifth or sixth grade, defendant told her in his parked car that "he would eat [her] out" and put his hand on her thigh or knee, and she left the car.  She did not recall any incidents occurring after that.

On cross-examination, Jane 2 said she did not tell anyone what defendant did to her because she was afraid of him.  She did not recall defendant specifically threatening her.  She remembered that she told Detective Harrison that defendant put his finger inside her vagina one time, but at trial she was not sure this occurred.  She also told Harrison that defendant touched her vagina nearly every day, although, she testified, it happened "several" times a month.  She did not tell anyone before the week she testified that defendant touched her clitoris.  She denied in previous interviews that defendant touched her "thing" inside her clothes with his "thing" after first grade, that "anything happened in the room" with defendant during second grade, and that "anything happened with [defendant]" during third grade.

On redirect, Jane 2 testified that during her interview with Harrison she distinguished between defendant putting his finger into

the hole of her vagina and in between the lips of her vagina. She was uncomfortable with the talk and also referred to her "thing." She told Harrison that during kindergarten, defendant put his finger in her "thing," meaning touched her clitoris, five times, and maybe as many as 10. She also told him that it would happen at least three or four times a month. At one point, she told Harrison that defendant would touch her "thing" outside her clothing "almost every day" during kindergarten. She testified that she was feeling confused about the timing of how often and when incidents occurred when she spoke to Harrison. Over time, she had more time to think about it, and testified incidents happened "[t]he majority of the time that [she] spent" at the Bellevue Street home, more than once a month, at least once each school year, and at least once each summer vacation period.

***Other Prosecution Evidence***

The girl's mother, Eileen, testified that she learned of the allegations for the first time on December 20, 2006, from Harrison. When her daughters were young, she did not notice anything unusual when she bathed them, and did not notice or hear them complain about their private parts. The girls took family trips where defendant went along.

Lydia C. was a sister-in-law to defendant, and lived in the Bellevue Street house from 1995 to 2005. In 1995, she worked during the day, usually coming back to the house around 4:30 p.m. She recalled that sometimes one or the other of the girls would go upstairs to defendant's room, at his call, to pluck his white hair, which, she said, children commonly do for men in Filipino culture. The girls were scared, did not want to go upstairs, and made excuses, but defendant was very demanding. The girls would go up to defendant's room and the door would be closed. Sometimes they came downstairs crying. Defendant would say they were fighting, but Lydia never saw them fight. She expressed her concerns, apparently to her mother-in-law, but this continued. Defendant was like a father figure to the girls.

Clinical Social Worker Miriam Wolfe testified as an expert in child sexual abuse accommodation syndrome. She said that abused children often engage in secrecy, helplessness, entrapment and accommodation, delayed, conflicted or unconvincing disclosures, and retraction. In her experience, it was common for children to continue to be in the presence of their abusers.

The parties entered into a stipulation concerning a forensic nurse practitioner's January 2007 physical examinations of Jane 1 and Jane 2, which was read to the jury. Jane 1 told the nurse practitioner that the last incident with defendant occurred seven years before the examination; defendant penetrated her vagina with his finger and penis; she experienced pain and bleeding with the first penetration; and since the abuse she had had consensual sex with another person. The nurse practitioner found an "absence of hymenal tissue at the six o'clock position, "which was an abnormal finding, was definite evidence of sexual contact, and was consistent

United States District Court
For the Northern District of California

with the history by Jane 1.  However, the nurse practitioner was not able to state defendant caused it.

Jane 2 told the nurse practitioner that defendant's acts occurred when she was five to nine years old; defendant penetrated her vagina with his penis on one occasion and his finger on several occasions; she experienced bleeding with the first penetration; and she had since had consensual sex with another person.  The nurse practitioner found an "absence of hymenal tissue at the one o'clock position" and multiple notches on the hymen, which was an abnormal finding, definite evidence of sexual contact and consistent with the history provided by Jane 2.  However, the nurse practitioner was not able to state defendant caused them.

### *The Defense Case*

Ken L. testified for the defense.  He was born in 1989, and was first cousin to Jane 1 and Jane 2.  The three played together from kindergarten or the first grade.  Relatives babysat him at the Bellevue Street house while his parents worked.  His grandfather or defendant would meet him after school and bring him to their house around 3:30 p.m. He and Jane 1 would watch television or movies, or play video games, in defendant's room.  Defendant would be there sometimes, and started going to the Bellevue Street house regularly after school in second grade.  He was close to Jane 1 and Jane 2, and stopped spending time with them in seventh or eighth grade.  Jane 1 never mentioned that defendant did anything to her, and Ken did not see anything that suggested Jane 1 did not want to be around defendant.

### *Verdict and Sentencing*

The jury found defendant guilty on all counts, and found the substantial sexual contact and One Strike allegations to be true.

Defendant moved for a new trial and also requested an evidentiary hearing based on his contentions of juror misconduct.  The court denied both.  As requested by the prosecution, the court sentenced defendant to one indeterminate prison term of 15 years to life for count 1 pursuant to the One Strike allegation.  It imposed terms totaling 14 years for counts 2, 3, 14, and 15, to run consecutively, and six-year terms for each of the remaining counts, to run concurrently.  Defendant was sentenced to a total indeterminate term of 29 years to life.

(Op. at 3-10.)

### DISCUSSION

## I.    Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a

United States District Court

For the Northern District of California

person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable

United States District Court

For the Northern District of California

application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.  The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion.  See Ylst, 501 U.S. at 805.  In this case, that is the opinion of the California Court of Appeal on direct review with respect to Petitioner's claim of juror misconduct.  (Ans. Ex. 6.)  The other claims were raised for the first time in habeas petitions to the California Supreme Court, which summarily denied them.  (Ans. Exs. 10, 12.)

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions.  See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Id. at 1307 (citation omitted).  With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

///

C.     **Claims and Analysis**

Petitioner claims the following grounds for federal habeas relief: (1) juror misconduct; (2) actual innocence; and (3) ineffective assistance of counsel based on five alleged failures.

1.     **Juror Misconduct**

Petitioner first claims that the trial court erred in its rulings regarding his claim of juror misconduct.

The California Court of Appeal reviewed what occurred during the proceedings with respect to this claim:

> After the presentation of the evidence and before closing arguments, the court substituted in alternate Juror No. 2 for another juror (having substituted in alternate Juror No. 1 earlier for another juror).  The next day, during deliberations, the foreperson of the jury sent a note to the court, which stated, "We need for the judge to determine whether jurer [*sic*] alt. #2 undestands [*sic*] what's going on with charges, responsibly."  The court responded in writing that it needed additional time to discuss the matter with counsel and suggested that the jury recess for the evening and resume deliberations the next morning.
>
> The next morning, the court discussed the note with counsel and proposed the following response:
>
> "Once the juror is selected, the nature of a juror's understanding of the nature of the charges is not within the purview of the court, so long as he or she is willing and able to deliberate. Jurors have different backgrounds, education levels, emotional capacities and ways of expressing themselves. [¶] Be as patient as you can possibly be with each other in explaining your views to each other, and in allowing others to explain their views, during your deliberations.  Treat one another courteously and with dignity, recognizing your different backgrounds, and the fact that you have never worked with each other before. [¶] It is the duty of each of you to talk with one another and to deliberate in the jury room.  The role of each of you is to be an impartial judge of the facts, not to act as an advocate for one side or the other.  Please try to work together to decide the issues before you. [¶] Please reread Jury Instructions 1110 and 3550."
>
> Counsel stipulated to forego a hearing with alternate Juror No. 2, and agreed to the wording of the court's response.  However, defense counsel asked that the court add that "each juror is entitled to his or her own individual opinion."  The prosecutor objected on the ground that CALCRIM No. 3550 sufficiently addressed the matter. The court denied the request, and sent its written response to the jury.

At 9:17 a.m., the court received a handwritten note from Juror No. 4. The note stated: "I think one juror-Alternate # 2 has English as a second language. Therefore receptive language is better than expressive language. I am not sure it has impact on his cognition [*sic*] of the facts. I believe that rereading parts of the transcript will/may help ~~break~~ him today." (Cross-out in the original.)

The prosecutor suggested that the court send a response stating that if the jury needed to have the transcript reread, they needed to specify which parts. Defense counsel objected that the note received by the court did not indicate that the jury collectively or individually wanted the transcript reread, but insinuated that the alternate juror needed it, although there was no indication that he wanted to needed anything reread, nor that he had any problems with the language or with understanding anything.

Defense counsel further argued that the crossing out of the word "break" clearly showed the jury's intention to coerce alternate Juror No. 2 "into coming to another conclusion for that which may have been expressed by the majority," and moved for a mistrial. The prosecutor responded that it was "completely speculative" because the word "break" had been removed from the note, and nothing in the note indicated that the jury was pressuring or coercing the individual juror.

The court found that the note was not clear, that there were many interpretations, and would not speculate. It considered sending a note telling the jurors that they had a right to request a read back of testimony, but needed to specify the parts requested, and denied defendant's request for a mistrial.

Defense counsel then made a series of motions. First, he moved for a hearing to question Juror No. 4, whom he said he saw that morning sitting with alternate Juror No. 2 on the bench outside the jury room having an animated discussion about something. Defense counsel asserted they might have been discussing alternate Juror No. 2's understanding, and moved for the court to question Juror No. 4 about whether they discussed any part of the case. The prosecutor argued this was speculation. The court found the defense counsel's observations insufficient to require a hearing, and denied defendant's motion.

Defense counsel then moved that the court conduct a hearing to ask alternate Juror No. 2 whether Juror No. 4 had been talking to him about the case outside the jury room and whether he felt intimidated, or whether Juror No. 4 or others were trying to "break" him. Once more, the prosecutor argued defense counsel's request was based on speculation. The court denied this motion as well. Defense counsel then moved again for a mistrial, which the court also denied.

Over defendant's objection, the court sent a note to the jury at 9:35 a.m. The note stated that "before testimony can be read back, the testimony being requested must be specified."

United States District Court

For the Northern District of California

At 11:05 a.m., the jury informed the court that it had reached a verdict.  The jury convicted defendant of all charges.

Before sentencing, defendant retained new counsel, who moved for a new trial based in part on the court's refusal to grant defendant's motions for a mistrial and a hearing on purported juror misconduct.  Defense counsel also asked the court to conduct an evidentiary hearing to examine jurors regarding the purported misconduct issue.  The court denied these requests.  It stated, "There is nothing inappropriate about jurors having a conversation out in the hallway.  There just simply was no evidence of misconduct in this case except to the extent that we contort and read into language that which I don't think is a fair inference."  The court also stated that even if there was misconduct, it did not rise to the level of reversible error.

(Op. at 26-28.)

The state appellate court then rejected this claim:

Defendant argues that the "[n]otes from [the jury foreperson and Juror No. 4] coupled with defendant counsel's observations demonstrated a strong probability that juror misconduct was occurring and triggered a duty of the court to inquire to determine whether there was juror misconduct, and the court's failure to do so, or to grant [defendant's] motion for a mistrial and later for a new trial, requires reversal."  We disagree.

A juror is subject to discharge if he or she acquiesces to the majority simply because the majority has reached a verdict, as this undermines a defendant's right to a unanimous verdict.  (*People v. Wilson* (2008) 43 Cal.4th 1, 27.)  A juror who violates a court's order not to discuss the case with other jurors outside of jury deliberations is also subject to discharge.  (*People v. Halsey* (1993) 12 Cal.App.4th 885, 892.)

A trial court must conduct a sufficient inquiry to determine the existence of juror misconduct "whenever the court is put on notice that good cause to discharge a juror may exist." (*People v. Burgener* (1986) 41 Cal.3d 505, 519.)  "When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*."  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051; see also *People v. Tuggles* (2009) 179 Cal.App.4th 339, 383-384 [defendant has a due process right to a hearing on juror misconduct].)  "Thus, where the trial court is presented with a credible prima facie showing that serious misconduct has occurred, the trial court may order jurors to appear at a hearing and to answer questions about whether misconduct occurred."  (*Tuggles*, at pp. 385-386.)

However, "not every incident involving juror's conduct requires or warrants further investigation."  (*People v. Cleveland* (2001) 25 Cal.4th 466, 478.)  In particular, "caution must be exercised in determining whether a juror has refused to deliberate.  California courts have recognized the need to protect the sanctity of

United States District Court

For the Northern District of California

jury deliberations." (*Id.* at p. 475.) "Jurors may be particularly reluctant to express themselves freely in the jury room if their mental processes are subject to immediate judicial scrutiny. The very act of questioning deliberating jurors about the content of their deliberations could affect those deliberations." (*Id.* at p. 476.) "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct – like the ultimate decision to retain or discharge a juror – rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." (*People v. Ray* (1996) 13 Cal.4th 313, 343.)

The trial court acted within its discretion when it found no need to further investigate with regard to alternate Juror No. 2. Defense counsel argued juror misconduct based on the cross out of the word "break" in Juror No. 4's note, but, as the court indicated, any theories about the use of the word were speculation. Similarly, defense counsel's conclusions from the observation that Juror No. 4 and Juror No. 2 were engaged in an animated exchange outside the jury room were speculative. The court acted well within its discretion to conclude that these episodes were not sufficient bases for allegations of misconduct, and did not err by denying counsel's motions for further hearings and inquiries.

For these same reasons, the court did not err in denying defendant's motions for a mistrial and a new trial. The trial court must grant a motion for mistrial when a party's chances of receiving a fair trial have been irreparably damaged. (*People v. Avila* (2006) 38 Cal.4th 491, 573.) The trial court possesses broad discretion, however, in ruling upon such a motion, which we review for an abuse of discretion. (*Ibid.*)

Similarly, in ruling on a request for a new trial based on jury misconduct, the trial court must determine whether the affidavits supporting the motion are admissible; if so, whether the facts establish misconduct; and, if they do, whether the misconduct was prejudicial. (*People v. Dorsey* (1995) 34 Cal.App.4th 694, 703-704.) "A trial court has broad discretion in ruling on each of these issues, and its rulings will not be disturbed absent a clear abuse of discretion." (*Id.* at p. 704.)

The court did not abuse its discretion in the present case when it denied defendant's motion for a mistrial and a new trial because it could reasonably conclude that there was no evidence of juror misconduct before it, given the speculation presented to it. Defendant's argument is without merit.

(Op. at 28-30.)

Respondent argues that there is no clearly established Supreme Court law stating that due process requires a trial court hold a hearing whenever evidence of juror bias comes to light. (Ans. at 9.) Respondent asserts that in the absence of such precedent,

United States District Court

For the Northern District of California

1     the trial court's refusal to hold a hearing cannot support federal habeas relief.  (Id.)

2            Respondent is correct.  Clearly established federal law, as determined by the

3     Supreme Court, does not require state or federal courts to hold a hearing every time a

4     claim of juror bias is raised by the parties.  Tracey v. Palmateer, 341 F.3d 1037, 1045

5     (9th Cir. 2003); see, e.g., Estrada v. Scribner, 512 F.3d 1227, 1241 (9th Cir. 2008)

6     (district court did not abuse its discretion in declining to hold hearing on juror bias

7     where state court's determination was not unreasonable in finding two jurors were not

8     actually biased, and that juror bias could not be presumed based on jurors' honesty

9     during voir dire); Sims v. Rowland, 414 F.3d 1148, 1153 (9th Cir. 2005) (trial court

10    need not order a hearing sua sponte whenever presented with evidence juror bias).

11    Remmer v United States, 347 U.S. 227 (1954), and Smith v. Phillips, 455 U.S. 209

12    (1982), do not stand for the proposition that any time evidence of juror bias comes to

13    light, due process requires the trial court to question the jurors alleged to have bias.

14    Smith states that this "may" be the proper course, and that a hearing "is sufficient" to

15    satisfy due process.  Tracey, 341 F.3d at 1044 (citing Smith, 455 U.S. at 217, 218).

16    Smith leaves open the door as to whether a hearing is always required and what else

17    may be "sufficient" to alleviate any due process concerns.  Id.; see, e.g., Davis v.

18    Woodford, 384 F.3d 628, 652-53 (9th Cir. 2004) (upholding state trial court's implicit

19    rejection of juror bias claim, where juror submitted note to judge before deliberations

20    expressing skepticism about whether defendant would remain in prison if jury returned

21    a noncapital sentence, and judge provided a detailed instruction that jurors should

22    presume that state officials would properly perform their duties when executing the

23    sentence but did not conduct an investigation); Tracey, 341 F.3d at 1044-45 (concluding

24    that state trial court's decision not to question juror further to obtain names of other

25    jurors and to take additional testimony from them was not contrary to, or an

26    unreasonable application of, clearly established Supreme Court precedent).

27           Here, the trial court was presented with only speculative evidence of juror

28    misconduct based on: 1) defense counsel's theory that the crossing out of the word

United States District Court

For the Northern District of California

1  "break" in Juror No. 4's note indicated the jury's intention to coerce alternate Juror No.

2  2; and 2) counsel's observation that Juror No. 4 and Juror No. 2 were engaged in an

3  animated exchange outside the jury room.  There was nothing in the note as otherwise

4  written to support defense counsel's theory, and a heated conversation between jurors

5  outside of the jury room is not sufficient indication of juror misconduct to warrant a

6  hearing.  Furthermore, there is no Supreme Court precedent requiring the trial court

7  order a hearing on every allegation of juror misconduct.  See Tracey, 341 F.3d at 1044-

8  45.  Rather, "long-recognized and very substantial concerns support the protection of

9  jury deliberations from intrusive inquiry."  Tanner v. United States, 483 U.S. 107, 127

10  (1987).  The state appellate court discussed the sanctity of jury deliberations and the

11  danger of judicial scrutiny.  See supra at 12-13.  Therefore, it reasonably concluded that

12  the trial court acted within its discretion in denying the motion for a hearing, which was

13  based merely on defense counsel's speculations, in order to protect the jury deliberation

14  process.  Id. at 13.  Lastly, because there was no evidence of juror misconduct, it cannot

15  be said that the trial court erred in denying a motion for mistrial based thereon.

16       Based on the foregoing, it cannot be said that the state court's rejection of this

17  claim was either contrary to, or involved an unreasonable application of, clearly

18  established Supreme Court precedent.  See 28 U.S.C. § 2254(d).  Petitioner is not

19  entitled to habeas relief on this claim.

20       **2.       Actual Innocence**

21       Petitioner claims that his right to due process was violated because the

22  conviction was based on false evidence and he is actually innocent.  (Pet. at 9.)

23       "Claims of actual innocence based on newly discovered evidence have never

24  been held to state a ground for federal habeas relief absent an independent constitutional

25  violation occurring in the underlying state criminal proceeding."  Herrera v. Collins,

26  506 U.S. 390, 400 (1993).  "This rule is grounded in the principle that federal habeas

27  courts sit to ensure that individuals are not imprisoned in violation of the

28  Constitution—not to correct errors of fact."  Id.  After Herrera, the Ninth Circuit

United States District Court

For the Northern District of California

initially found that there could be no habeas relief based solely on a petitioner's actual innocence of the crime in a non-capital case.  See Coley v. Gonzalez, 55 F.3d 1385, 1387 (9th Cir. 1995); Swan v. Peterson, 6 F.3d 1373, 1384 (9th Cir. 1993), cert. denied, 513 U.S. 985 (1994).  But it has since assumed without deciding that freestanding actual innocence claims are cognizable in federal habeas proceedings in both capital and non-capital cases under the standard set forth in Carriger v. Stewart, 132 F.3d 463 (9th Cir. 1997) (en banc).  See Osborne v. District Attorney's Office, 521 F.3d 1118, 1130-31 (9th Cir. 2008), rev'd and remanded on the grounds, 557 U.S. 52 (2009); see also United States v. Berry, 624 F.3d 1031, 1038 n.5 (9th Cir. 2010) (noting that Ninth Circuit "recognizes a claim of actual innocence that is cognizable under [28 U.S.C.] § 2255") (citing Carriger, 132 F.3d at 476).[2]

The petitioner's burden under Carriger is "extraordinarily high," and requires a showing that is "truly persuasive."  132 F.3d at 476 (quoting Herrera, 506 U.S. at 417).  To be entitled to relief, the petitioner must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.  See id.; Jackson v. Calderon, 211 F.3d 1148, 1165 (9th Cir. 2000).  Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction.  See Carriger, 132 F.3d at 476.

Here, Petitioner fails to affirmatively prove that he is probably innocent.  As evidence, he offers the declaration of his wife, Sol Cauyong, dated October 8, 2013, who asserts that the victims, her nieces, admitted to her that they lied but were afraid to tell the truth because they could be charged with perjury.  (Pet. App. B at 2.)  Mrs. Cauyong states that she believed her nieces lied because she stopped providing them with financial assistance.  (Id. at 1.)  She also asserts that the victims lied about not

_____

[2]The Supreme Court again left the question open when it reversed the Ninth Circuit in Osborne.  See District Attorney's Office for Third Jud. Dist. v. Osborne, 557 U.S. 52, 71 (2009).

United States District Court

For the Northern District of California

having contact with her and the Petitioner after 2007, and that there are photos of them spending holidays and birthdays together along with her deceased father. (Id.) However, her credibility must be viewed with great suspicion because of her close and ongoing relationship with Petitioner. Furthermore, this evidence fails to rebut the victims' detailed testimonies at trial about Petitioner's repeated acts of molestation when they were very young children. The fact that they may have had further contact with Petitioner after 2007 is not evidence that the molestations did not occur. In addition, Respondent points out that Mrs. Cauyong's theory of why the victims lied conflicts with Petitioner's offered reason, which was that "they were extremely upset at Petitioner for hitting her (Sol) and spanking Tiffany (Petitioner's daughter) so hard that he was leaving bruises." (Pet. at 8(G).) There was also the testimony of Lydia C., a sister-in-law to Petitioner, who observed that Petitioner would often have the victims upstairs in his room alone and with the door closed. See supra at 6. She testified that the victims were scared, would make excuses, and often come back down crying. Id. In light of the strong evidence presented at trial of his guilt, Petitioner has failed to meet Carriger's "extraordinarily high" burden of presenting "truly persuasive" evidence of his actual innocence. 132 F.3d at 476. Accordingly, the state court's rejection of this claim was neither contrary to, nor involved an unreasonable application of, clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on this claim.

### 3.    Ineffective Assistance of Counsel

Petitioner asserts that his trial counsel rendered ineffective assistance because he: (a) failed to effectively communicate with him; (b) failed to adequately investigate and discover exculpatory evidence; (c) failed to subpoena witnesses; (d) failed to present evidence that victims had reason to wrongfully accuse Petitioner of the crimes; and (e) failed to adequately inform Petitioner of his right to testify.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance

was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. See Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011); Williams (Terry) v. Taylor, 529 U.S. 362, 404-08 (2000). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. See Pinholster, 131 S. Ct. at 1410-11; Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (same); Premo v. Moore, 131 S. Ct. 733, 740 (2011) (same). The general rule of Strickland, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 131 S. Ct. at 788.

### a. Failure to Communicate

Petitioner claims that his native language is Tagalog, and that he is not fluent in English. (Pet. at 8.) He claims that although a Tagalog interpreter was appointed, trial counsel continually spoke to him without the interpreter present, which "guaranteed that Petitioner would not understand the proceedings, thereby making it so Petitioner could not participate in his defense." (Id.)

Respondent asserts that the claim as alleged is too general to support relief. (Ans. at 11-12.) Specifically, Petitioner fails to identify any particular point in the trial

1    where he was unable to understand the proceedings or assert what he would have done

2    differently if he had understood.  (Id. at 11.)  Respondent also asserts that Petitioner

3    clearly has some proficiency in English: 1) Petitioner had spoken to the police in

4    English; 2) the preliminary hearing was conducted without an interpreter,  (Reporter's

5    Transcript ("RT") 6); and 3) Petitioner had moved to Canada from the Philippines after

6    high school, where he lived for five years.  (Ans. at 12, fn. 5.)  Respondent points out

7    that Petitioner never complained during trial that counsel was speaking to him without

8    an interpreter or that he did not understand the proceedings.  (Id. at 12.)

9         Petitioner's claim fails because he has not shown prejudice, Strickland's second

10   prong: "there is a reasonable probability that, but for counsel's unprofessional errors,

11   the result of the proceeding would have been different."  466 U.S. at 694.  As

12   Respondent points out, Petitioner does not identify any particular point in the trial

13   where, had he understood the proceedings, he would have done things differently.  As

14   Respondent points out, no interpreter was provided at the preliminary hearing, yet

15   Petitioner never complained of a deficiency in communication at that time or at any

16   time thereafter.  Accordingly, it cannot be said that trial counsel rendered ineffective

17   assistance in this regard.  The state court's rejection of this claim was not an

18   unreasonable application of Supreme Court precedent, and Petitioner is not entitled to

19   federal habeas relief on this claim.  See 28 U.S.C. § 2254(d).

               **b.    Failure to Investigate[3]**

20

21        Petitioner also claims that counsel was ineffective for failing "to conduct an

22   adequate investigation that would have yielded exculpatory evidence that would have

23   undermined the prosecution's case."  (Pet. at 9(A).)  Specifically, Petitioner claims that

24   trial counsel failed to elicit testimony from defense witness Kenneth Llona that the

25   victims' mother, Eileen Hart, had told him that she was going to "'get back'" at

26   Petitioner for hitting her sister, i.e., Petitioner's wife.  (Id.)  Petitioner claims that had

27

28            [3]Respondent did not address this claim in the answer.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    trial counsel elicited this information, he could have then confronted Mrs. Hart with this

2    testimony and "may have elicited information that there was in fact a motive to falsely

3    accuse Petitioner of the crimes." (Id.)  Petitioner also asserts that Mrs. Hart was

4    motivated to have her daughters falsely accuse him of molestation because he had told

5    her husband that she was having an extra-marital affair.  (Id.)

6         This claim also fails because Petitioner fails to show prejudice.  He admits that

7    the alleged testimony "*may have* elicited information" showing that the accusations

8    were false.  However, this is a speculative outcome and is not sufficient to show that the

9    result of the proceeding would have been different had such information come to light.

10   Mrs. Hart testified at trial that she became aware of the allegations for the first time

11   from Detective Harrison in 2006.  See supra at 6.  Jane 1 testified that she had recently

12   decided to disclose the abuse because she had just learned that her younger sister had

13   also been abused and she was concerned for Petitioner's eight-year-old daughter.  Id. at

14   3.  There was nothing to indicate that her mother had prompted Jane 1 to make false

15   allegations, or that Jane 2 was also coached.  Jane 1 and Jane 2 gave extensive and

16   detailed testimonies at trial of the years of abuse by Petitioner.  In light of the extensive

17   nature of the allegations made by the victims against Petitioner, it is not likely that an

18   effort to point at revengeful motives on the part of the victims' mother by the defense

19   would have been successful and resulted in a different outcome for Petitioner.

20   Strickland, 466 U.S. at 694.  Accordingly, the state court's rejection of this claim was

21   not an unreasonable application of Supreme Court precedent, and Petitioner is not

22   entitled to federal habeas relief on this claim.  See 28 U.S.C. § 2254(d).

23              **c.    Failure to Call Alibi Witnesses[4]**

24        Petitioner claims that trial counsel was ineffective for failing to "call, secure, or

25   subpoena alibi witnesses who lived at the residence where the alleged molestation was

26   alleged to have occurred."  (Pet. at 9(A).)  Specifically, Petitioner asserts that trial

27

28              [4]Respondent did not address this claim in the answer.

counsel should have called his wife and her father as witnesses because they would have provided crucial testimony that Petitioner never abused the victims.  (Id. at 9(B), 9(C).)  Petitioner states that he is unable to provide a declaration from his father-in-law, Ben Paglinawan, because he passed away in 2012.  (Id. at 9(C).)  Accordingly, any testimony which Petitioner alleges Mr. Paglinanwan would have given is purely hearsay and does not support this claim.  However, Petitioner states that his wife, Sol Cauyong, would have testified that Petitioner was not alone with the victims as they alleged.  (Id.)

Petitioner's claim fails because he cannot show that had his wife testified at trial, it would have resulted in a different outcome.  Strickland, 466 U.S. at 694.  As discussed above, any testimony by his wife would have been viewed with great suspicion because the nature of their relationship rendered her credibility weak.  See supra at 16.  It would have been her word against that of the victims, and in light of the extensive nature of the allegations, it is not likely that a jury would have believed Petitioner's wife over the victims.  Accordingly, the state court's rejection of this claim was not an unreasonable application of Supreme Court precedent, and Petitioner is not entitled to federal habeas relief on this claim.  See 28 U.S.C. § 2254(d).

### d. **Failure to Present Evidence**

Petitioner claims that trial counsel knew that the victims had a possible motive to lie about the molestations but failed to present it has evidence.  (Pet. at 9(C).)  Specifically, the prosecution brought up Petitioner's 2005 misdemeanor conviction for willful cruelty against a child, i.e., his daughter Tiffany, because she believed that "'part of the defense in this case was going to be that the girls had, in fact, made this up [the allegations against Petitioner] as a result of ongoing hostilities between their mother and [Petitioner's] wife as a result of the conviction of the 273A.'"  (Pet. at 9(C)-9(D), citing RT 18-19.)  Therefore, Petitioner claims, trial counsel knew about this possible motivation by the victims to lie and yet failed to argue it or mention it during trial.  (Id. at 9(E).)

Respondent asserts that defense counsel made a tactical decision with respect to

United States District Court

For the Northern District of California

1  the evidence of Petitioner's violent character, and that strategic decision must be given

2  deference.  Ans. at 16.  Respondent points to the fact that defense counsel moved to

3  exclude evidence of Petitioner's character for violence, including the misdemeanor

4  conviction for hitting his daughter and evidence that he had physically abused his wife.

5  (RT 36, 41-42.)  The trial court held that the victims could testify about acts of violence

6  they had personally witnessed by Petitioner for the limited purpose of explaining their

7  fear of Petitioner and delay in reporting the molestation.  (RT 42-43.)  At trial, when

8  Jane 1 testified about Petitioner's "bad temper," threats, and the fact that he had hit his

9  daughter hard enough to leave bruises, defense counsel objected as irrelevant and was

10  overruled.  (RT 315-317.)

11      Under a "doubly" deferential judicial review, see Pinholster, 131 S. Ct. at 1410-

12  11, the Court finds that Respondent has presented a reasonable argument that trial

13  counsel satisfied Strickland's deferential standard.  Harrington, 131 S. Ct. at 788.

14  Considering the already offensive nature of the charges against Petitioner, trial counsel

15  was reasonable in deciding to avoid any other evidence that would cast Petitioner in a

16  worse light.  Furthermore, it is not likely that the jury, had they been presented with the

17  evidence, would have believed that the victims lied about being molested in order to

18  protect their aunt and niece from physical harm.  Rather, the victims' testimonies

19  revealed that the process of disclosing the molestation and testifying at trial was a

20  difficult and traumatic experience, which bolsters their credibility.  (Ans. at 17.)

21  Accordingly, it cannot be said that Petitioner would have received a more favorable

22  result but for trial counsel's failure to argue that the victims lied about the molestation.

23  Strickland, 466 U.S. at 694.  Therefore, the state court's rejection of this claim was not

24  an unreasonable application of Supreme Court precedent, and Petitioner is not entitled

25  to federal habeas relief on this claim.  See 28 U.S.C. § 2254(d).

### e.      **Failure to Inform of Right to Testify**

27      Petitioner's last claim is that trial counsel failed to adequately inform him of his

28  right to testify at trial, resulting in the denial of Petitioner's right to testify on his own

United States District Court

For the Northern District of California

behalf. (Pet. at 9(E).)  Petitioner claims that their conversation about him testifying at trial was done without the benefit of a Tagalog interpreter, and that he did not understand that he had a right to testify. (Id. at 9(F).)  Therefore, when he was asked by the trial court if he wanted to testify, Petitioner claims that he waived his right "out of ignorance and not understanding that he actually did have the right to testify." (Id.)

Respondent asserts that the trial record refutes Petitioner's claim that he did not understand that he had a right to testify. (Ans. at 17-18.)  At the end of the defense case, counsel stated on the record that after a discussion, Petitioner had decided not to testify.  The trial court then directly asked Petitioner, through the interpreter, "Mr. Cauyong, you understand that you have a right to testify in this case.  It's totally your decision.  You understand that?"  Petitioner said, "Yes."  The trial court then asked, "And do you wish to testify or not testify in this case?"  Petitioner said, "No.  Not testify.  I will not testify."  The trial court asked counsel if he believed this was a knowing decision by Petitioner, and counsel said yes. (RT 592.)

Petitioner's claim is without merit.  Even if trial counsel had failed to clearly explain to Petitioner that he had a right to testify, this error was later rectified by the trial court's specific exchange with Petitioner with respect to this right through an interpreter as shown by the record.  Furthermore, Petitioner does not claim that he would have in fact testified on his own behalf or what specific testimony he would have given that would have changed the result of the proceeding.  Accordingly, it cannot be said that but for counsel's failure, the outcome would have been different.  Therefore, the state court's rejection of this claim was not an unreasonable application of Supreme Court precedent, and Petitioner is not entitled to federal habeas relief on this claim.  See 28 U.S.C. § 2254(d).

## CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

1   Further, a Certificate of Appealability is **DENIED**.  See Rule 11(a) of the Rules

2   Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the

3   denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner

4   demonstrated that "reasonable jurists would find the district court's assessment of the

5   constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484

6   (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this

7   Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal

8   Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254

9   Cases.

   The Clerk shall terminate any pending motions, enter judgment in favor of

Respondent, and close the file.

   **IT IS SO ORDERED.**


DATED:   _____10/1/2015_____            _____
                                                EDWARD J. DAVILA
                                                United States District Judge

United States District Court
For the Northern District of California

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

WILFREDO CORTEZ CAUYONG,

                Petitioner,

   v.

CONNIE GIBSON, Warden,

                Respondent.

_____/

Case Number: CV12-02606 EJD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on _____10/5/2015_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Wilfredo Cortez Cauyong G-60778
California Institution for Men, (CIM)
Facility C, Butte 224up
PO Box 500
Chino, CA 91708-0500

Dated: _____10/5/2015_____

                        Susan Y. Soong, Clerk
                   /s/By: Elizabeth Garcia, Deputy Clerk